JAMES FULLERTON ET AL. *v.* DEPARTMENT OF
REVENUE SERVICES, GAMING POLICY BOARD
(SC 15848)

Callahan, C. J., and Borden, Palmer, Peters and Leuba, Js.

Argued June 4—officially released July 21, 1998

*William F. Gallagher*, with whom was *Kurt D. Koehler*, for the appellants (plaintiffs).

*Robert F. Vacchelli*, assistant attorney general, with whom were *Pamela A. Raposa*, and, on the brief, *Richard Blumenthal*, attorney general, for the appellee (defendant).

*Joseph J. Packtor*, with whom, on the brief, was *James F. McCormack*, for the appellee (Connecticut Lottery Corporation).

*Opinion*

CALLAHAN, C. J. The sole issue in this administrative appeal is whether the plaintiffs, James Fullerton and Mary Fullerton, the holders of one of two Lotto tickets with all six winning numbers from the December 21, 1993 Lotto drawing, are entitled to the entire first level prize from that drawing because the holder of the other ticket did not come forward within one year of the drawing. The plaintiffs claim that they are entitled to the entire prize, rather than one half of the prize, because: (1) they were the only "winners" of the drawing in that the holder of the second ticket never came forward; and (2) failure to award them the entire first level prize would violate § 12-568-1 (e) (1) of the Regulations of Connecticut State Agencies, which provides that "[a]t least forty-five percent (45%) of the total gross sales in any lottery game shall be returned as prizes to holders of winning tickets." We disagree with the

plaintiffs' claim and conclude that the trial court properly dismissed their administrative appeal.

The parties[1] stipulated to the following facts. James Fullerton purchased a Lotto ticket at G&S Video in Wallingford on December 21, 1993. There was a Lotto drawing that evening, and the six winning numbers selected matched those on the plaintiffs' ticket. On May 10, 1994, the plaintiffs presented their winning ticket to the lottery claims center in Newington and were informed that two tickets containing the six winning numbers had been sold for the December 21, 1993 drawing. The second ticket containing the same six winning numbers as the Fullertons' ticket had been purchased on December 21, 1993, at the Depot Deli in Roxbury (Roxbury ticket). The plaintiffs were told, therefore, that they were entitled to only one of the two shares of the first level prize pool of $5,618,438.86.[2] Thus, the plaintiffs' share of the first level prize pool was valued

[1] The defendants are the department of revenue services, gaming policy board (board) and the Connecticut Lottery Corporation (lottery corporation). The initial action was brought in the trial court by the plaintiffs against the board. On appeal, the board raised the issue of mootness, asserting that Public Acts 1997, No. 97-233, transferred the lottery to the lottery corporation. On January 15, 1998, acting sua sponte, we ordered that the appeal be stayed without prejudice to the filing of a motion to join the lottery corporation as a necessary party. On February 15, 1998, we granted the plaintiffs' motion to join the lottery corporation as a party, and the lottery corporation filed its brief on April 17, 1998. At oral argument on June 4, 1998, the board conceded that, with the lottery corporation properly joined as a party, the case is no longer moot. Thus, we need not address the issue of mootness.

[2] Notice of Game Procedures, Connecticut Lotto, § V (A) (1) provides in relevant part: "Winner(s) matching all six (6) of the winning numbers in any order will equally share the first-level prize pool. The first-level prize pool will be equal to 34.182% of LOTTO sales applicable to said drawing and it shall be funded by LOTTO sales proceeds and unclaimed lottery prizes in accordance with procedures described hereinbelow. . . ." The game procedures that govern the Connecticut Lotto program are adopted by the division of special revenue, with the advice and consent of the gaming policy board, pursuant to §§ 12-568-1 (c) and 12-568-5 (b) of the Regulations of Connecticut State Agencies, and are on file with the division.

at $2,809,219.43,[3] payable in twenty annual installments of $94,809.97.[4]

Three weeks prior to the expiration of the claim period for the Roxbury ticket, a "Search for the Missing Millionaire" media promotion was conducted. When the holder of the Roxbury ticket failed to claim his or her share of the prize within the one year claim period, which expired December 21, 1994,[5] the unclaimed share of the prize reverted to the prize structure for the

---

[3] The value of *each* share of the first level prize pool for the December 21, 1993 Lotto drawing was calculated as follows:

Current Sales for Dec. 21, 1993 Drawing

$1,992,252.00
  x 34.182%         (first level percent allocation)
$ 680,991.58

Carry Forward Sales   ("Roll over" funds)

$6,930,257.00
  x 34.182%         (first level percent allocation)
$2,368,900.45

| | |
|---|---|
| First level allocation from Dec. 21, 1993 sales: | $ 680,991.58 |
| First level allocation from carry forward sales: | 2,368,900.45 |
| Total pool allocation for first level prize: | $3,049,892.03 |
| + Augmentation (from unclaimed prize money) | +$ 300,000.00 |
| | $3,349,892.03 |
| Divide by number of winning tickets | 2 |
| = Adjusted pool | $1,674,946.01 |
| x Annuity factor | x 1.6772 |
| Value of each share of first level prize: | $2,809,219.43 |

[4] A check was issued for $94,811 ($140,461 less federal and state taxes) representing the first installment payment of the plaintiffs' share of the prize, with nineteen additional annual installments of $94,809.97 due on or about May 10 of each year.

[5] Section 12-568-5 (c) (2) of the Regulations of Connecticut State Agencies provides in relevant part: "To be valid, claims must be presented to the division within the following time periods . . .

"(B) Category 2, On-line: One year from the drawing date printed on the ticket. . . ."

December 23, 1994 Lotto drawing, pursuant to § 12-568-5 (p) of the Regulations of Connecticut State Agencies.[6]

On December 23, 1994, the plaintiffs sent a facsimile to John B. Meskill, executive director of the division of special revenue (division), making a demand for immediate payment of the unclaimed one-half portion of the first level prize for the December 21, 1993 Lotto drawing. Meskill sent a letter to the plaintiffs denying their demand for payment on the basis of his opinion that the plaintiffs were entitled to and had received only one of the two shares of the first level prize pool for the December 21, 1993 Lotto drawing. Meskill stated in his letter that the failure of the other winning ticket holder to present that ticket for validation did not convert the plaintiffs' ticket into the one winning ticket for the December 21, 1993 Lotto drawing. Rather, he stated that "[t]he number of winners and the portion of their share of the prize pool is determined very shortly after the drawing . . . ."

The plaintiffs appealed to the gaming policy board (board), which held a hearing regarding the plaintiffs' claim to the other one half of the first level prize pool.[7] The board upheld Meskill's ruling. The plaintiffs thereafter appealed to the trial court, which dismissed the

[6] Section 12-568-5 (p) of the Regulations of Connecticut State Agencies provides: "Unclaimed prizes. The division shall retain for the holder of a winning ticket any prize which that holder has not claimed. If the prize remains unclaimed at the expiration of the appropriate time period pursuant to subsection (c) (2) of this section such prize shall revert to the prize structure of future lottery games to be distributed to future winners. Unclaimed prize money from one game or type or category of game may be added to the prize structure of another game or type or category of game at the discretion of the executive director."

[7] Section 12-568-3 (b) of the Regulations of Connecticut State Agencies provides in relevant part: "Powers and duties. The gaming policy board shall work in cooperation with the division of special revenue to implement and administer the provisions of the act. In carrying out its duties the board's responsibilities shall include, but not be limited to . . .

plaintiffs' appeal, concluding that the board's decision was not illegal, arbitrary or an abuse of its discretion, and that the lottery regulations were neither vague nor standardless. Furthermore, the court concluded that the 45 percent payout requirement of § 12-568-1 (e) (1) applies to the lottery in general, rather than to the individual games, and that the board's interpretation comports with the regulatory requirements. The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023, now § 65-1, and General Statutes § 51-199 (c).

I

"The standard of review of an agency decision is well established. Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts. . . . *Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion.* . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the *courts, and not administrative agencies,* to expound and apply governing principles of law." (Emphasis in original; internal quotation marks omitted.) *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services,* 244 Conn. 378, 389, 709 A.2d 1116 (1998). Because our review of questions of law is plenary, we

"(4) Hearing all appeals as provided in the act, the regulations, and the division's rules of practice and hearing procedures. . . ."

address the substantive merits of the plaintiffs' appeal. Id., 390.

The plaintiffs first assert that, under the applicable lottery regulations, they are the only "winners" of the December 21, 1993 Lotto drawing, and, therefore, are entitled to the entire first level prize. Specifically, the plaintiffs argue that, although the regulations refer to "winners" and "holders of winning tickets," they do not define the term "winner." The plaintiffs contend that when § 12-568-1 (e) (1) and § 12-568-5 (p) are read together, the term "winner" must mean a person holding a ticket containing all six of the winning numbers drawn *who presents the ticket to the claims center for payment*. In other words, the plaintiffs maintain that in order to be a winner one must not only hold a winning ticket, but must also present the winning ticket to the claims center.

According to the defendants' contrary interpretation of the relevant regulations and the Lotto game procedures, a winner is any ticket holder whose ticket matches all six of the winning numbers drawn. They do not interpret the regulations to require that a winner be a person who has presented a ticket to the claims center for payment. In support of their argument, the defendants rely on § V (A) (1) of the Lotto game procedures, which provides in part that "[w]inner(s) matching all six (6) of the winning numbers in any order will equally share the first-level prize pool." The defendants contend that § V (A) (1) of the game procedures contemplates that there may be more than one winning ticket because the first level prize pool is divided equally by the number of winners. Furthermore, the defendants claim that § 12-568-5 (p) provides for the reversion of unclaimed prize money if winning ticket holders fail to present their claims for the prize within the claim period. We agree with the defendants.

The division of special revenue has broad statutory authority to adopt regulations pertaining to the state lottery, including regulations relating to prize payments. See General Statutes § 12-562 and General Statutes (Rev. to 1995) § 12-568 (a).[8] "Our rules of statutory construction apply to administrative regulations." *Preston* v. *Dept. of Environmental Protection*, 218 Conn. 821, 829 n.9, 591 A.2d 421 (1991). Although the plaintiffs are correct that the regulations do not contain an express definition of the term winner, we conclude that the regulations establish that a winner is determined at the time of the drawing.

One who purchases a ticket for an authorized lottery game agrees to abide by the lottery regulations and is

[8] General Statutes § 12-562 provides: "(a) Except as provided in subsection (b) of this section, the executive director shall have power to enforce the provisions of this chapter and chapter 226b, and with the advice and consent of the board, shall adopt all necessary regulations for that purpose and for carrying out, enforcing and preventing violation of any of the provisions of this chapter, for the inspection of licensed premises or enterprises, for insuring proper, safe and orderly conduct of licensed premises or enterprises and for protecting the public against fraud or overcharge. The executive director shall have power generally to do whatever is reasonably necessary for the carrying out of the intent of this chapter; and may call upon other administrative departments of the state government and of municipal governments for such information and assistance as he deems necessary to the performance of his duties.

"(b) The special policemen in the Division of Special Revenue and the legalized gambling investigative unit in the Division of State Police within the Department of Public Safety shall be responsible for the criminal enforcement of the provisions of this chapter and chapter 226b. They shall have the powers and duties specified in section 29-7c."

General Statutes (Rev. to 1995) § 12-568 (a) provides: "The executive director, with the advice and consent of the board, shall determine the number of times a lottery shall be held in each year, the form and price of the tickets therefor and shall award prizes to winning participants, determined in a manner designated by the executive director. The proceeds of the sale of tickets shall be deposited in the lottery fund from which prizes shall be paid, upon vouchers signed by the executive director, or by either of two persons designated and authorized by him, in such numbers and amounts as the executive director determines." Public Acts 1996, No. 96-212, § 31, repealed General Statutes § 12-568, effective July 1, 1996. Public Acts 1996,

bound by the official procedures of that particular game. Regs., Conn. State Agencies § 12-568-5 (a) and (b).[9] Section V (A) (1) of the Lotto game procedures provides in part that "[w]inner(s) matching all six (6) of the winning numbers in any order will equally share in the first-level prize pool." Section V (A) (1) also provides that the first level prize pool, in addition to being funded by 34.182 percent of the Lotto sales applicable to that drawing, also is funded by unclaimed lottery prizes. Section 12-568-5 (p) requires the division to "retain for the holder of a winning ticket any prize which that holder has not claimed. . . ." If at the expiration of the claim period any prize remains unclaimed, it "shall revert to the prize structure of *future* lottery games to be distributed to *future* winners. . . ."[10] (Emphasis added.) Regs., Conn. State Agencies § 12-568-5 (p).

The provisions of § 12-568-5 (p) and § V (A) (1) of the game procedures clearly contemplate that a winner

No. 96-212, § 23, subsequently codified as General Statutes § 12-568a, was adopted and became effective July 1, 1996. Because that was subsequent to the action before us, we look to the authority of General Statutes (Rev. to 1995) § 12-568.

[9] Section 12-568-5 (a) of the Regulations of Connecticut State Agencies provides: "Generally. One who participates in an authorized lottery game by purchasing a ticket from a licensed lottery agent or by lawfully receiving a ticket so purchased by another shall be deemed for the purposes of this rule a purchaser, and such purchaser agrees to abide by all provisions of these regulations and agrees further to the conditions of this section."

Section 12-568-5 (b) of the Regulations of Connecticut State Agencies provides: "Official procedure. A purchaser shall be bound by the official procedures of the particular game as on file with the division."

[10] The first level prize pool for the December 21, 1993 Lotto drawing was augmented by $300,000 from past prizes that were unclaimed at the expiration of their respective claim periods. See footnote 3 of this opinion. Thus, the plaintiffs benefited from this system of reverting unclaimed prizes to the prize structure of future lottery games to be distributed to future winners. The plaintiffs now ask this court to declare this regulatory scheme arbitrary so that they may receive, in addition to their winnings, the unclaimed share from the Roxbury ticket, a result that would deprive future winners of the same augmentation benefit.

is determined at the time of the drawing. After the drawing, the division is required to divide the prize pool into as many shares as there are winners, and retain each share until it is claimed. Upon a winning ticket holder's failure to claim the prize within the applicable claim period, the prize reverts to the prize structure of future games to be distributed to future winners.

Further support for the defendant's interpretation of the term winner is found in the definitions set forth in the lottery regulations. Pursuant to § 12-568-2 (a) (11) of the Regulations of Connecticut State Agencies,[11] a "drawing" is defined as the "process as established in the procedures whereby *winners in a lottery game are conclusively determined.*" (Emphasis added.) Although the term winner is not defined expressly, § 12-568-2 (a) (11) makes it clear that a winner is "conclusively determined" at the time of the drawing.

Applying the plain language of the regulations and the Lotto game procedures, we are persuaded that the term winner means the holder of a ticket that matches all six of the winning numbers selected. Thus, contrary to the plaintiffs' position, winners are conclusively determined at the time of the drawing, not at the time of presentment of the ticket. We conclude, therefore, that because there were two winning tickets drawn in the December 21, 1993 Lotto game, there were two winners. The plaintiffs therefore are entitled to one half of the first level prize pool. The trial court properly concluded that the plaintiffs have been awarded their one-half share and are not entitled to the share that was payable to the holder of the Roxbury ticket. See *Booker* v. *Rogers*, 256 Ill. App. 3d 605, 628 N.E.2d 1192 (1994) (holder of one of two winning Lotto tickets not

---

[11] Section 12-568-2 (a) (11) of the Regulations of Connecticut State Agencies provides: "Drawing. That process as established in the procedures whereby winners in a lottery game are conclusively determined."

entitled to entire prize when other ticket is not presented for collection).

## II

The plaintiffs also contend that adoption of the defendants' construction of the regulations will result in a violation of § 12-568-1 (e) (1), which provides that "[a]t least forty-five percent (45%) of the total gross sales in any lottery game shall be returned as prizes to holders of winning tickets." The plaintiffs argue that at least 45 percent of the total gross sales for a given Lotto drawing must be distributed to winners of that Lotto drawing, rather than to winners of future drawings. We disagree.

Section 12-568-1 (e) (1) requires that at least 45 percent of the total gross sales in any lottery *game* shall be returned as prizes to the holders of winning tickets. The plaintiffs are confusing the broader term "game" with the more narrow term "drawing." The term "game" as used in the lottery regulations refers generally to the "different types of lottery games" established by the executive director with the advice and consent of the board. Regs., Conn. State Agencies § 12-568-1 (b).[12]

Thus, § 12-568-1 (e) (1) applies to the distribution of the sales of the games in *general*, rather than to any individual drawing. Therefore, the 45 percent distribution requirement applies, in general, over time, to the various "games" run by the agency, and not to any particular *drawing* of any game.

---

[12] Section 12-568-1 (b) of the Regulations of Connecticut State Agencies provides: "Games. The different types of lottery games shall be established by the executive director with the advice and consent of the board. For purposes of these regulations, the types or categories of games shall be (1) instant; (2) on-line; (3) others, including any variations of these. Any game or type or category of game, once having been established may thereafter be discontinued in similar manner provided reasonable notice of such intention is given at a regularly scheduled board meeting. Except as otherwise provided herein, a discontinuation shall not affect the rights of those who purchased tickets prior to the effective date of termination."

Moreover, if we were to adopt the interpretation urged by the plaintiffs, after the expiration of each claim period, the defendants would be required to supplement the winnings of all levels of winners who had claimed their prizes by the amount of the unclaimed prize. If the division intended to take on this substantial burden, it could have drafted the regulation so that the 45 percent requirement applied to each "drawing." Furthermore, § 12-568-5 (p) provides that unclaimed prizes "shall revert to the prize structure of future lottery games to be distributed to future winners." See footnote 6 of this opinion. Thus, § 12-568-5 (p) clearly contemplates that unclaimed, undisbursed portions of the 45 percent prize payout should be paid not to winners of a particular drawing, but to future lottery game winners.

When interpreting a regulation, we must use common sense. *Citerella* v. *United Illuminating Co.*, 158 Conn. 600, 609, 266 A.2d 382 (1969). "Courts must assume that a reasonable and rational result was intended and construe the regulation accordingly." Id. When confronted with two possible interpretations, courts will adopt the interpretation that makes the regulations effective and workable, and not the one that leads to unreasonable results. *Red Hill Coalition, Inc.* v. *Town Plan & Zoning Commission*, 212 Conn. 727, 737–38, 563 A.2d 1347 (1989). "The unreasonableness of the result obtained by the acceptance of one possible alternative interpretation of an act is a reason for rejecting that interpretation in favor of another which would provide a result that is reasonable." *Maciejewski* v. *West Hartford*, 194 Conn. 139, 151–52, 480 A.2d 519 (1984). We must presume that a reasonable and rational result was intended by the division in adopting § 12-568-1 (e) (1). See id., 152.

The unreasonableness of the plaintiffs' interpretation of § 12-568-1 (e) (1) compels us to reject that interpretation in favor of the interpretation advanced by the division and affirmed by the trial court. See id. The trial

court correctly concluded that an adoption of the plaintiffs' interpretation would lead to confusion and an administrative burden that would interfere with the defendants' ability effectively to operate the lottery. The division has interpreted the 45 percent requirement to apply to lottery distribution as to particular catagories of games in general, over time, not to each lottery drawing. This interpretation provides for an effective and workable method of distributing the regulatory 45 percent mandate.

The judgment is affirmed.

In this opinion the other justices concurred.